UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**JUDGE KOELTL**

-------------------------------------------------------- x

ARTHUR STEINBERG, AS TEMPORARY RECEIVER )   Civil Action No.
OF SAGAM CAPITAL MANAGEMENT CORP. **04  CV  2339**
SAGAM CAPITAL LLC; B.B.C.F.D., S.A., and )
SKILLED INVESTORS INC.,                  )   **COMPLAINT**
                                         )
                Plaintiffs,              )
                                         )
        v.                               )
                                         )
BANK JULIUS BAER & CO., LTD. and         )
WAXFIELD LTD.                            )
                                         )
                Defendants.              )
                                         )
-------------------------------------------------------- x

## COMPLAINT

Arthur Steinberg, as the receiver (the "Receiver") appointed by this Court in the

action styled *Securities and Exchange Commission v. Yehuda Shiv, Sagam Capital Management*

*Corp. and Sagam Capital LLC*, Civ. Action No. 01 CV 11282 (Hellerstein, J.) (the "SEC

Action"), B.B.C.F.D., S.A. (a Panamanian corporation "B.B.C.F.D.") and Skilled Investors Inc.

(a Panamanian corporation "Skilled"), hereinafter "Plaintiffs", by their undersigned attorneys, as

and for their complaint against Bank Julius Baer & Co., Ltd. (New York Branch) (the "Bank"),

and Waxfield Ltd. (Waxfield), allege as follows:

### NATURE OF THE ACTION

1.     On December 10, 2001, the Securities and Exchange Commission (the

"SEC") commenced the SEC Action against Yehuda Shiv ("Shiv"), Sagam Capital Management

Corp. ("Sagam CMC") and Sagam Capital LLC ("Sagam LLC") (Sagam CMC and Sagam LLC,

along with such other Sagam CMC affiliates made part of the SEC Action, hereinafter, referred to collectively as the "Sagam Entities").

2.      From at least 1994 through 2001 ("Relevant Period"), Shiv, through the Sagam Entities and other Shiv-controlled entities, provided investment advisory services to clients, including without limitation, the management of securities and other investments held in accounts ("Client Accounts") at the Bank.  The SEC Action alleges, *inter alia*, that Shiv and the Sagam Entities committed violations of the Securities Act of 1933, the Securities Exchange Act of 1934 and the Investment Advisors Act of 1940 by, among other things, (a) distributing false account statements to the beneficial owners ("Account Holders") of the Client Accounts purporting to show investment gains (when, in fact, there were steep losses), and collecting performance fees on the inflated account values reported in the statements, and (b) improperly causing the transferring of funds out of the Client Accounts.

3.      On or about January 27, 2003 the Court entered the Consent Judgment (as herein defined) against Shiv, and he was subsequently incarcerated.

4.      B.B.C.F.D. is an Account Holder, a victim of the improper conduct of the Sagam Entities and thus a creditor of the Sagam Entities.

5.      Skilled is an Account Holder, a victim of the improper conduct of the Sagam Entities and thus a creditor of the Sagam Entities.

6.      On December 10, 2001, the Court entered an order (the "Injunction Order") which provided, among other relief, for the appointment of receiver to administer the estates of the Sagam Entities.

7.      By Order of this Court dated December 12, 2001, the Receiver was appointed as Receiver for the Sagam Entities.

8.      As a result of his ongoing investigation of the business activities and financial condition of the Sagam Entities, the Receiver has determined that the combined assets of the Sagam Entities and two other Shiv-controlled entities known as Sagam Corp. ("Sagam Corp.") and Sagam Management Investment ("Sagam MI") include not less than $4,282,000 of investment funds (the "Investments") held in four (4) separate accounts at Defendant. Sagam Corp. and Sagam MI are predecessors to or alter egos of the Sagam Entities and their assets should be considered part of the Sagam Entities and under the control of the Receiver.

9.      On or about June 2, 1998, Shiv executed agreements on behalf of both Sagam CMC and Sagam Corp. pledging and granting a security interest in all of their funds and other assets in any account at the Bank to the Bank to secure "any and all present or future obligations due to [the Bank]" by Waxfield (hereinafter, the "Sagam CMC Pledge" and the "Sagam Corp. Pledge").[1]

10.      Thereafter, on or about June 7, 2000, Shiv executed agreements on behalf of Sagam LLC and Sagam MI pledging and granting a security interest in all of their funds and other assets in any account at the Bank to the Bank to secure "any and all present or future obligations due to [the Bank]" by Waxfield (hereinafter, the "Sagam LLC Pledge" and the "Sagam MI Pledge," and collectively, together with the Sagam CMC Pledge and the Sagam Corp. Pledge, the "Pledges").

---

[1]      The Sagam CMC Pledge was actually executed on behalf Sagam Management Corporation. However, an amendment was filed with the Secretary of State on May 8, 1997 changing the name of that entity from "Sagam Management Corp." to "Sagam Capital Management Corp."

11.     On or about August 13, 2001, Flame Corp. ("Flame") pledged, among other things, Bank Account 409979 ("Flame Account") to secure the alleged obligations of Sagam LLC to the Bank.

12.     Flame is owned by Shiv and his family, and the amounts in the Flame Account represents fees improperly paid by Account Holders to the Sagam Entities on account of the improper conduct of the Sagam Entities, for purported services relating to the Client Accounts.

13.     In accordance with the terms of a Consent to Final Judgment dated January 9, 2003 (the "Consent Judgment") agreed to by Yehuda Shiv, and the terms of a settlement agreement dated January 21, 2003, by and among the Receiver, Yehuda Shiv and his wife Dalia Shiv, which was approved by the District Court on March 10, 2003 (the "Settlement Agreement"), Yehuda Shiv and his wife agreed, with limited exceptions, to turn over to the Receiver all of their assets, which encompasses all right, title and interest of Yehuda and Dalia Shiv in Flame and the Flame Account, which was specifically identified as an asset turned over to the Receiver in both the Consent Judgment (paragraph 4(d) thereof) and the Settlement Agreement (paragraph 1(d) thereof).  Notice of the Settlement Agreement was provided to the Account Holders and to the Bank, and the Receiver received no objection thereto.

14.     In view of the foregoing, the Flame Account should be considered an asset of the Sagam Entities and under the control of the Receiver.

15.     Waxfield has asserted that it has a lien on the Investments and the Flame Account.  It is the position of Plaintiffs that no such lien exists in favor of Waxfield.

16.     Among the powers granted to the Receiver in the Injunction Order was to (i) "take all steps he deems necessary to secure and protect the assets and property of the [Sagam Entities]," and (ii) "commence, maintain, defend or participate in legal proceedings, to sue for, collect, receive and take into possession all goods, chattels, rights, general intangibles, choses in action, credits, monies, effects, lands, books and records of account" of the Sagam Entities.

17.     Pursuant to these powers, the Receiver, has commenced this action as an ancillary suit to the main SEC Action, *inter alia* (i) to compel a turnover of the Investments and the Flame Account from the Bank to the Receiver on the ground that there are currently no obligations due and owing from Waxfield to the Bank for the Investments or the Flame Account to secure; (ii) to avoid the Pledges on the Investments and the Flame Account as constructive fraudulent conveyances under New York Debtor and Creditor Law §§ 273, 274, and 275, and recover the full value of the Investments and the Flame Account; (iii) to avoid the Pledges and the pledge of the Flame Account as made with actual intent to hinder, delay and defraud under New York Debtor and Creditor Law § 276, and recover the full value of the Investments and the Flame Account; and (iv) for a Declaratory Judgment that Waxfield does not have a lien on the Investments or the Flame Account.

18.     B.B.C.F.D. and Skilled, as creditors of the Sagam Entities, are named as Plaintiffs solely to provide standing, in the event that the Receiver's standing is successfully challenged by Defendants, and B.B.C.F.D. and Skilled agree to turn over any recoveries received by them on account of this action to the Receiver for distribution to creditors of the Sagam Entities (which include B.B.C.F.D. and Skilled) who have not received or who have fully disgorged funds improperly transferred to them by Shiv and the Sagam Entities. The Receiver intends to move in the SEC Action, by a separate pleading for an order directing that all funds

improperly transferred to the beneficial owners of any Client Accounts be disgorged and returned to the beneficial owners of the Client Accounts from which such funds were improperly transferred.

## JURISDICTION AND VENUE

19.     Paragraph XIII.B of the Preliminary Injunction Order provides that "no creditor . . . of the Defendants [i.e., the Sagam Entities], or any person acting on behalf of such creditor . . . shall take any action to interfere with the taking control, possession, or management of the assets transferred to the temporary receiver  under this Order, *nor interfere in any way with the exclusive jurisdiction of this Court over the receivership estate*." (emphasis added).  Since this action seeks to have assets of the receivership estate transferred to the Receiver free and clear of all purported liens of third parties, it is ancillary to the main SEC Action and this Court has subject matter jurisdiction.  This Court also has jurisdiction pursuant to 28 U.S.C. §§1332(a) and 2201.  The amount in controversy exceeds $75,000.

20.     Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c), the Bank and Waxfield being found in and transacting business in this District.

## PARTIES

21.     Arthur Steinberg was appointed as receiver for the Sagam Entities in the SEC Action under the Preliminary Injunction Order, and has a place of business at Kaye Scholer LLP, 425 Park Avenue, New York, New York 10022.

22.     B.B.C.F.D. is a Panamanian corporation with its principal place of business in New York, New York.

23.     Skilled is a foreign corporation organized under the laws of Panama.

24.    The Bank is a Swiss corporation with its principal place of business in Switzerland, with an office at 330 Madison Avenue, New York, New York 10017.

25.    Waxfield is a British Virgin Islands corporation, and has appeared in this Court in connection with the SEC Action.

## FACTS

### The Business Activities of the Sagam Entities

26.    During the Relevant Period, Shiv and the Sagam Entities acted as money managers on behalf of at least 35 Client Accounts, including B.B.C.F.D. and Skilled, primarily investing client funds in foreign currencies and mortgage-backed securities.

27.    All of the Client Accounts were securities accounts with the Bank.

28.    Some Account Holders purportedly provided a power of attorney to Shiv and/or the Sagam Entities with respect to their accounts.

29.    The Account Holders suffered financial losses in their Accounts based on investment decisions recommended and/or made by Shiv. To conceal such mounting losses so that Account Holders would continue to hold their money at the Bank and to attract other Account Holders and potential customers, Shiv began to falsify client account statements. Shiv continued such deceptive practices during the Relevant Period, creating false account statements for clients which failed to show trading losses, and instead showed that his trading in the Accounts had generated profits of approximately 10% per year.

30.    By October 31, 2001, as more fully discussed below, Shiv had overstated the net value of assets in ten Client Accounts (the "Misreported Accounts") by at least $183 million. Moreover, Shiv and the Sagam Entities and Flame continued to profit during the course of the deception by, among other things, paying themselves millions of dollars in management

and performance fees based on the inflated asset values. Shiv and the Sagam Entities also improperly transferred millions of dollars from some Client Accounts (including B.B.C.F.D. and Skilled) to - or for the benefit of - the beneficial owners of other unrelated Client Accounts (including Waxfield and Exeed Corp.) without the consent knowledge or approval of the transferor Account Holders.

**The Receiver's Investigation**

31.    Pursuant to the Injunction Order, the Receiver, among other things, was empowered to take and retain immediate possession, custody and control of all assets and property and the books and records of the Sagam Entities, and conduct an investigation of the past and present operations, activities and condition of the Sagam Entities.

32.    On February 28, 2002, the Receiver filed a preliminary report ("Report") in the SEC Action summarizing the result of his investigation as of that date. Among other things, the Report notes the following:

(a)    On an aggregate basis, the actual balance of the Misreported Accounts as of October 31, 2001 was $26,727,898. However, according to the false statement distributed by Shiv and the Sagam Entities, the aggregate balance of these accounts for the same period was $209,687,037, reflecting a sizeable discrepancy in the amount of $182,959,139.

(b)    The combined unaudited balance sheet of the Sagam Entities as of November 30, 2001, showed assets as follows: Cash - $87,800; Investments - $4,281,000; Other current assets - $111,607; Fixed assets - $17,508; Deposits - $11,345. The liabilities for the same period are: Loan payable to Shiv - $276,061; Equity/retained earnings - $4,233,199.

33.    In reality, as of at least the date of the Pledges and through the date hereof, the Sagam Entities were insolvent based on the improper acts committed against the Account Holders.

## The Close Business Relationship Between the Bank and the Sagam Entities

34.    The Bank and the Sagam Entities shared a close business relationship that transcended the customary relationship between a bank and a money manager.

35.    As of the commencement of the SEC Action, the Bank and the Sagam Entities had been doing business together for approximately 15 years.

36.    By 1994, the Sagam Entities had become the largest client of the Bank both in terms of "assets" and "credit", and the largest revenue provider with revenue contributions of $8-10 Million during 1994.

37.    The Sagam Entities continued to remain a large and important client of the Bank and a significant revenue contributor up and until the commencement of the SEC Action.

38.    The Bank acted as sponsor, custodian, asset manager and lender for The Jewel of the Diadem Fund (the "Jewel Fund"), an offshore fund established by Shiv in 1997.

39.    The Bank assisted the Sagam Entities with the marketing of the Triumph Leveraged Appreciation Fund ("Triumph Fund") and the Jewel Fund, funds established by Shiv to implement his investment strategies.

40.    Among other things, the Bank organized joint presentations with Shiv to promote the Triumph Fund and other investments to potential investors, and promote Shiv's investment strategies.

41.    Shiv had close and ongoing working relationships with various senior executives and other employees of the Bank, including without limitation, specialists in trading, foreign exchange and risk management.

42.    Shiv periodically met with members of the family that controls the Bank. Officers or representatives of the Bank and Shiv met jointly with Account Holders, and during such meetings the Bank's officers or representatives either said nothing and/or agreed with Shiv when Shiv explained to the Account Holders that there was no difference between the false account statements prepared by Shiv and the account statements issued by the Bank.

43.    The principal place of business of the Sagam Entities for a substantial portion of the Relevant Period was office space subleased from the Bank beginning in mid-1994 at the Bank's premises at 330 Madison Avenue in New York City.

44.    The Bank and the Sagam Entities jointly cooperated in the acquisition and formation of companies in the British Virgin Islands ("BVI Companies") for the purpose of setting up accounts at the Bank in the name of such BVI Companies on behalf of various Account Holders.

45.    The Sagam Entities made certain gratuitous gifts of money and/or articles of value to certain senior officers of the Bank.

46.    Shiv had access to the MIS Department of the Bank, which facilitated his ability to produce the false financial statements that were delivered to Account Holders.

47.    Shiv purportedly used a power of attorney to pledge Client Accounts to secure obligations owed to the Bank by the Sagam Entities. The owners of the Client Accounts never confirmed the pledge of their Client Accounts to the Bank. This highly unusual action

made or should have made the Bank aware of the improper manner in which Shiv was purportedly using his power of attorney for clients with the Bank.

48.     Shiv purportedly used a power of attorney to have one Client Account secure the reimbursement obligation owed to the Bank under a letter of credit issued by the Bank to an unrelated and different Account Holder.  The owner of the Client Account being pledged never confirmed the pledge of its Client Account to the Bank.  This highly unusual action made or should have made the Bank aware of the improper manner in which Shiv was purportedly using his power of attorney for clients with the Bank.

49.     Shiv purportedly used a power of attorney to transfer funds from one Client Account to either another unrelated Client Account or to the Sagam Entities.  This highly unusual action made or should have made the Bank aware of the improper manner in which Shiv was purportedly using his power of attorney for clients with the Bank.

**The Transactions Involving Waxfield**

50.     As explained in paragraphs 51 through 55 infra, Shiv purportedly used a power of attorney to have one Client Account secure the obligations owed to the Bank by another client of Shiv.  This highly unusual action made or should have made the Bank aware of the improper manner in which Shiv was purportedly using his power of attorney for clients with the Bank.

51.     On or about May 16, 1997, Waxfield was incorporated in the British Virgin Islands as an international business company.

52.     On or about May 22, 1997, general powers of attorney to act on behalf of Waxfield were issued to Shiv, and to Baruch and Neomi Ivcher.  Upon information and belief, Baruch and Neomi Ivcher are the beneficial owners of Waxfield.

53.    On or about September 10, 1997, an application was completed by Baruch and Neomi Ivcher on behalf of Waxfield to open an account in Waxfield's name at the Bank.

54.    On or about October 20, 1997, Shiv executed an agreement substantially identical in form and language to the Pledges, pledging to the Bank all of Waxfield's funds and other assets in accounts at the Bank to secure "any and all present or future obligations due to [the Bank]" from Sydney Plastics Holding Corp. ("Sydney")  and Eclectic Holdings, Inc. ("Eclectic").

55.    The owners of Waxfield claim to have no equity interest in either Sydney or Eclectic.

56.    The beneficial owner of Sydney and Eclectic was Menachem Ivcher, an important customer of the Bank.  Menachem Ivcher was also a principal of the Sagam Entities. Shiv, another principal of the Sagam Entities, purportedly used a power of attorney form and purportedly pledged the Waxfield account as collateral for the indebtedness owed to the Bank by Sydney and Eclectic.  The Bank permitted this purported pledge of the Waxfield account to occur by means of a power of attorney form even though it knew of the beneficial ownership interest that Menachem Ivcher had at both Sydney and Eclectic, on the one hand, and the Sagam Entities, on the other hand.

57.    At the time of the purported pledge by Waxfield, Sidney and Eclectic owed substantial sums to the Bank.  Sidney and Eclectic had insufficient assets to repay the same, and the Bank was aware of all of the foregoing.

58.    On or about January 12, 1998, pursuant to the general power of attorney purportedly granted to him with respect to Waxfield, Shiv executed an agreement substantially identical in form and language to the Pledges, pledging to the Bank all of Waxfield's assets in

accounts at the Bank to secure "any and all present or future obligations due to [the Bank]" from Productos Paraiso Del Peru S.A. ("Productos").

59.     Aside from purportedly receiving the above Pledges, the Bank never obtained a guaranty from Waxfield to secure the obligations of Sydney Eclectic and Productos.

60.     Despite having purportedly received the pledge of the Waxfield Account, the Bank permitted Waxfield to withdraw from time to time sums from its Client Account.

61.     On or about June 2, 1998, Shiv executed the Sagam CMC Pledge and the Sagam Corp. Pledge.

62.     On or about June 7, 2000, Shiv executed the Sagam LLC Pledge and the Sagam MI Pledge.

63.     Aside from pledging their assets in accounts at the Bank to secure the obligations of Waxfield, Sagam CMC, Sagam Corp., Sagam MI, and Sagam LLC (collectively, the "Pledgors") did not execute guaranties of the obligations of Waxfield to the Bank.

64.     Flame also pledged the Flame Account at the Bank to secure the purported Sagam LLC obligation owed to the Bank. Flame did not execute guaranties of the obligation of Waxfield or of the Pledgors to the Bank.

## COUNT I

### (Against The Bank)

### (Turnover of the Investments)

65.     The Receiver repeats and realleges each and every allegation contained in paragraphs 1 through 64 of this Complaint as if fully set forth herein.

66.     The Bank never obtained a guaranty from Waxfield of the obligations, if any, of Sydney, Eclectic and Productos to the Bank.

67.     Because the Bank never obtained a guaranty from Waxfield of the obligations, if any, of Sydney, Eclectic and Productos to the Bank, Waxfield is not currently indebted to the Bank for any sums.

68.     The Investments were pledged by the Pledgors to secure the obligations, if any, of Waxfield to the Bank.

69.     Because Waxfield is not currently indebted to the Bank, there are no obligations for the Investments to secure, and such Investments are free and clear of any encumbrances in favor of the Bank.

70.     Because the Investments are free and clear of any encumbrances in favor of the Bank, the Sagam Entities have an immediate and superior right of possession to the Investments as against the Bank.

71.     The Investments are a specifically identifiable asset held in specifically identifiable accounts at the Bank.

72.     The Receiver, on behalf of the Sagam Entities, has demanded in writing that the Bank return the Investments to the Sagam Entities.

73.     The Bank has wrongfully and intentionally refused to return the Investments to the Sagam Entities in accordance with Receiver's request.

74.     The Bank wrongful and intentional refusal to return the Investments to the Sagam Entities, and continued dominion and control over such Investments, interferes with and is in defiance with the superior possessory right of the Sagam Entities to the Investments.

75.     By reason of the foregoing, the Bank should be ordered to immediately turn over the Investments to the Receiver for the benefit of the Sagam Entities.

## COUNT II

### (Against The Bank)

### (Turnover of Flame Account)

76.     The Receiver repeats and realleges each and every allegation contained in paragraphs 1 through 75 of this Complaint as if fully set forth herein.

77.     The Flame Account was pledged to secure the obligation, if any, of the Sagam Entities to the Bank relating to the Waxfield transaction.

78.     Because the Sagam Entities are not currently indebted to the Bank, there are no obligations of the Sagam Entities for the Flame Account to secure, and such Flame Account is free and clear of any encumbrances in favor of the Bank with respect to any purported indebtedness of the Sagam Entities.

79.     Because the Flame Account is  free and clear of any encumbrances in favor of the Bank, the Sagam Entities have an immediate and superior right of possession to the Flame Account as against the Bank.

80.     The Flame Account is a specifically identifiable asset held in specifically identifiable accounts at the Defendant.

81.     The Receiver, on behalf of the Sagam Entities, has demanded in writing that the Bank return the Flame Account to the Sagam Entities.

82.     The Bank has wrongfully and intentionally refused to return the Flame Account to the Sagam Entities in accordance with the Receiver's request.

83.     The Bank's wrongful and intentional refusal to return the Flame Account to the Sagam Entities, and continued dominion and control over such Flame Account, interferes

with and is in defiance with the superior possessory right of the Sagam Entities to the Flame Account.

84.     By reason of the foregoing, the Bank should be ordered to immediately turn over the Flame Account to the Receiver for the benefit of the Sagam Entities.

## COUNT III

### (Against The Bank)

### (Avoidance and Recovery of Constructively Fraudulent Conveyance Under New York Debtor Creditor Law §§ 273, 274, and/or 275)

85.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 84 of this Complaint as if fully set forth herein.

86.     The Pledges and the pledge of the Flame Account were transfers of an interest in property under New York's fraudulent conveyance statute.

87.     On the dates when the Pledges and the pledge of the Flame Account were made the Pledgors and Flame (i) were insolvent or became insolvent as a result of such transfers; (ii) were engaged or about to be engaged in a business or transaction for which the capital remaining in their possession after the transfer was unreasonably small; or (iii) intended to or believed that they would incur debts beyond their ability to pay as such debts matured.

88.     The Pledges and the pledge of the Flame Account were given without fair consideration to the Pledgors and Flame.

89.     Given its close business relationship with the Pledgors and Flame as described above, the Bank was aware of circumstances that should have led it to inquire into the propriety of the Pledges and the Flame Account, but nevertheless failed to make such inquiries or

otherwise exercise ordinary diligence with respect to the Pledges and the pledge of the Flame Account.

90.    Given its close business relationship with the Pledgors and Flame as described above, the Bank knew or should have known that the Pledges and the pledge of the Flame Account would hinder, delay and defraud creditors in connection with their claims against the Pledgors and Flame.

91.    Given its close business relationship with the Pledgors and Flame as described above, the Pledgors, Flame and the Bank did not act in good faith in connection with the Pledges and the pledge of the Flame Account from the Pledgors and Flame.

92.    By reason of the foregoing, pursuant to Sections 273, 274 and 275 of the New York Debtor Creditor Law, the Pledges and the pledge of the Flame Account should be set aside in full, and the full value of the Investments and the Flame Account restored to the Receiver for the benefit of the Sagam Entities.

93.    In the event the relief requested herein by the Receiver cannot be granted to him, B.B.C.F.D. and Skilled request such relief and agree to turn over the Investments and Flame Account to the Receivership estate.

## COUNT IV

### (Against The Bank)

### (Avoidance and Recovery of Fraudulent Transfers Made with Actual Intent to Defraud New York Debtor Creditor Law Section 276)

94.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 93 of this Complaint as if fully set forth herein.

95.     The Pledgors and the Bank have shared a close business relationship for many years during which time, upon information and belief, the Pledgors were one of the largest and most lucrative clients of the Bank; numerous employees of the Bank maintained a close and ongoing working relationship with Shiv; the Bank actively assisted the Pledgors in the marketing and promotion of their investment funds to prospective investors; the Bank provided extensive back-end services for such funds; the Bank subleased space to the Pledgors; and the Pledgors (through Shiv) had access to the Bank's information systems.

96.     The Pledges and the pledge of the Flame Account were made when the Pledgors  and Flame were facing severe financial difficulties.

97.     Specifically, the tremendous losses suffered by the Client Accounts, and the fraudulent efforts of Shiv to conceal such losses by showing investment gains, gave rise to substantial claims by the Account Holders against the Pledgors and Flame.

98.     Nevertheless, despite knowledge of their precarious financial condition, the Pledgors and Flame pledged the Investments and the Flame Account and all of their other assets in accounts at the Bank to the Bank for no consideration to secure the obligations, if any, of an unrelated third party (i.e., Waxfield).

99.     Based on the foregoing, the Pledges and the pledge of the Flame Account were made with actual intent to hinder, delay, or defraud the creditors of the Pledgors and Flame and in reckless disregard for the rights of such creditors.

100.     Given its close business relationship with the Pledgors and Flame as described above, the Bank was aware of circumstances that should have led it to inquire into the propriety of the Pledges and the pledge of the Flame Account, but nevertheless failed to make

such inquiries or otherwise exercise ordinary diligence with respect to the Pledges and the pledge of the Flame Account.

101.    The beneficial owner of Sydney and Eclectic was Menachem Ivcher, an important customer of the Bank.  Menachem Ivcher was also a principal of the Sagam Entities. Shiv, another principal of the Sagam Entities, purportedly used a power of attorney form and purportedly pledged the Waxfield account as collateral for the indebtedness owed to the Bank by Sydney and Eclectic.  The Bank permitted this purported pledge of the Waxfield account to occur by means of a power of attorney form even though it knew of the beneficial ownership interest that Menachem Ivcher had at both Sydney and Eclectic, on the one hand, and the Sagam Entities, on the other hand.

102.    Given its close business relationship with the Pledgors and Flame as described above, the Bank knew or should have known that the Pledges and the pledge of the Flame Account would hinder, delay, and defraud creditors in connection with the payment of their claims against the Pledgors and Flame.

103.    By reason of the foregoing, pursuant to Section 276 of the New York Debtor Creditor Law, the Pledges and the pledge of the Flame Account should be set aside in full, and the full value of the Investments and the Flame Account recovered by the Receiver for the benefit of the Sagam Entities.

104.    In the event the relief requested herein by the Receiver cannot be granted to him, B.B.C.F.D. and Skilled seek such relief and agree to turn over the Investments and Flame Account to the Receivership estate.

## COUNT V

**(Against Waxfield)**

**(Declaratory Judgment)**

105.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 104 of this Complaint as if fully set forth herein.

106.    This Count is brought pursuant to 28 U.S.C. §2201.

107.    Waxfield has asserted that it has a lien on the Flame Account and the Investments.

108.    No such lien exists in fact or as a matter of law.

WHEREFORE, Plaintiffs demands judgment (i) setting aside the Pledges and the pledge of the Flame Account in full; (ii) ordering the return of the full value of the Investments and the Flame Account to the Receivership estate; (iii) declaring that Waxfield has no lien upon the Flame Account or the Investments and; (iv) awarding the Plaintiffs such other and further relief as this Court deems just, proper and equitable.

Dated: New York, New York
     March 23, 2004

               KAYE SCHOLER LLP

               By: _____
               Jay G. Strum (JS-5594)
               425 Park Avenue
               New York, New York  10022
               (212) 836-8000

               *Attorneys for the Receiver*

               LEAHEY & JOHNSON, P.C.

               By: _____
               Peter James Johnson (PJJ-8236)
               120 Wall Street
               New York, New York  10005
               (212) 269-7308

               *Attorneys for B.B.C.F.D., SA*

               WINSTON &   STRAWN LLP

               By: _____
               Richard F. Lawler (RL-2523)
               Micheal Friedman (MF-0251)
               200 Park Avenue
               New York, New York  10166
               (212) 294-6700

               *Attorneys for Skilled Investors Inc.*

WHEREFORE, Plaintiffs demands judgment (i) setting aside the Pledges and the pledge of the Flame Account in full; (ii) ordering the return of the full value of the Investments and the Flame Account to the Receivership estate; (iii) declaring that Waxfield has no lien upon the Flame Account or the Investments and; (iv) awarding the Plaintiffs such other and further relief as this Court deems just, proper and equitable.

Dated: New York, New York
        March 22, 2004

KAYE SCHOLER LLP

By:_____
Jay G. Strum (JS-5594)
425 Park Avenue
New York, New York  10022
(212) 836-8000

*Attorneys for the Receiver*


LEAHEY & JOHNSON, P.C.

By: _____
Peter James Johnson (PJJ-8236)
120 Wall Street
New York, New York  10005
(212) 269-7308

*Attorneys for B.B.C.F.D., SA*


WINSTON &   STRAWN LLP

By:_____
Richard F. Lawler (RL-2523)
Micheal Friedman (MF-0251)
200 Park Avenue
New York, New York  10166
(212) 294-6700

*Attorneys for Skilled Investors Inc.*

WHEREFORE, Plaintiffs demands judgment (i) setting aside the Pledges and the pledge of the Flame Account in full; (ii) ordering the return of the full value of the Investments and the Flame Account to the Receivership estate; (iii) declaring that Waxfield has no lien upon the Flame Account or the Investments and; (iv) awarding the Plaintiffs such other and further relief as this Court deems just, proper and equitable.

Dated: New York, New York
March 17, 2004

KAYE SCHOLER LLP

By:_____
Jay G. Strum (JS-5594)
425 Park Avenue
New York, New York  10022
(212) 836-8000

*Attorneys for the Receiver*

LEAHEY & JOHNSON, P.C.

By:_____
Peter James Johnson (PJJ-8236)
120 Wall Street
New York, New York  10005
(212) 269-7308

*Attorneys for B.B.C.F.D., SA*

WINSTON &   STRAWN LLP

By:_____
Richard F. Lawler (RL-2523)
Micheal Friedman (MF-0251)
200 Park Avenue
New York, New York  10166
(212) 294-6700

*Attorneys for Skilled Investors Inc.*